IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 2, 2010 Session

## STATE OF TENNESSEE v. SHEILA WHITE CARLTON

**Direct Appeal from the Circuit Court for Gibson County**
**No. 17841     William Acree, Jr., Judge**

---

**No. W2009-01004-CCA-R3-CD  - Filed February 18, 2010**

---

The Defendant-Appellant, Sheila White Carlton, was indicted for one count of burglary of an automobile, a Class E felony; one count of assault, a Class A misdemeanor; and one count of theft of property valued at $500 or less, a Class A misdemeanor.  A Gibson County Circuit Court jury subsequently acquitted Carlton of the burglary count, found her guilty of the theft count, and failed to reach a verdict on the assault count, which resulted in a mistrial on that count.  The trial court sentenced Carlton, whose prior criminal history included one conviction for vandalism, to eleven months and twenty-nine days probation after the service of sixty days in jail.  On appeal, Carlton argues that the evidence was insufficient to support her conviction.  Upon review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JERRY L. SMITH and J.C. MCLIN, JJ., joined.

Sheila White Carlton, Dyer, Tennessee, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Garry G. Brown, District Attorney General; and Jerald M. Campbell, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND

**Trial.** Holly Dunagen, Carlton's daughter, testified that Carlton had previously been convicted of vandalism on July 10, 2007.  The evidence at the jury trial on the vandalism charge showed that Carlton had used a horsewhip to whip a vehicle that belonged to Dunagen's son, Josh.  Dunagen said that although she thought she was going to testify at the

vandalism trial, she did not. As Dunagen was leaving the courthouse after the trial on the vandalism charge, she observed that her mother did not appear to be angry about the conviction, and she said that the bailiff in the courtroom also noted that her mother did not appear to be angry.

The same day following Carlton's vandalism conviction, Carlton knocked on Dunagen's door at her home. Just before opening the door, Dunagen picked up her eighteen-month-old Maltese dog, Charlie, to prevent him from running out of her home. Dunagen explained that she had originally gotten Charlie from Carlton, who had gotten the dog for her dog breeding business. Dunagen said that as Charlie had gotten older, it was clear that he would not be a good dog for breeding because he had numerous unfavorable traits. She said that Carlton had given her Charlie on a short-term basis when he was around eight weeks old. However, she said that after Carlton determined that Charlie would not be a good dog for breeding, she told Dunagen that Dunagen and her daughters could have the dog on a permanent basis. She said that Carlton had told Dunagen's daughters to think about a name to put on the dog's registration papers. Dunagen said that she and her daughters believed that Charlie was their dog for approximately a year, and Carlton did not pay money for Charlie's care or feeding expenses during this time period.

Upon hearing a knock, Dunagen opened her door and saw Carlton, who greeted her and asked if she could "see Charlie for a minute." Dunagen allowed her to hold the dog, and once Charlie was in Carlton's arms, she immediately turned around and began to walk away. Dunagen asked her what she was doing, and Carlton turned around and said, "This is my GD dog. You're not getting this GD dog back. You caused me to lose my Court [case] with Josh. I have been waiting for this day."

A short time later, Dunagen drove to pick up her two daughters from Carlton's home. Carlton ran out of the house as she drove up and began screaming at her. Dunagen told Carlton that she was there to pick up her daughters. Carlton dared her to get out of the car to get her daughters. Because Dunagen knew that Carlton had a history of violence, she remained in her car and honked the horn, hoping that her daughters would come out to her car. Her daughters did not leave Carlton's home at that time, but Carlton came out of her home and began screaming at Dunagen again. Carlton reached inside the window of Dunagen's car and scratched her face. Her daughters came out of Carlton's house crying, and they left. Dunagen stated that she had never been diagnosed with bipolar disorder.

Brooke Fetters, Dunagen's fifteen-year-old daughter, testified that Carlton had given them Charlie because she could not use him for breeding. Fetters said that Carlton told her that she would put their names on the dog's registration papers approximately six months before the instant offense. During this six month period, Carlton did not provide any money for the dog's food or care and never visited the dog. Fetters admitted that her family never

-2-

received the registration papers, but she said that her family believed that Charlie was their dog because of Carlton's behavior and statements. She also said that Carlton told her that she had to sell Charlie to pay for her vandalism case involving Josh.

Bethaney Lowery, Dunagen's thirteen-year-old daughter, testified that approximately a year before the instant offense Carlton had taken Charlie because she was angry but later gave him back to them. At some later time, Lowery learned from Fetters that Carlton had concluded that Charlie was not a good dog for breeding and had given them Charlie to keep.

Carlton, the Defendant-Appellant, testified that she earned part of her income from breeding dogs. She stated that she did not have a "good relationship" with Dunagen. Carlton claimed that Dunagen had been a "rebellious" child and did not have a job. She also asserted that she had provided housing for Dunagen and had bought her cars and furniture, which Dunagen had sold for money. Carlton stated that Dunagen was "a convincing liar" and said that she believed that Dunagen suffered from a bipolar disorder.

Carlton denied that there was anything wrong with Charlie, other than the fact that he had a "little hernia." She admitted to getting Charlie immediately after she was convicted in the vandalism trial, but she claimed that she had already told her granddaughters that she would need Charlie for a few days because she needed some money for her divorce. She also claimed that Dunagen turned Charlie over to her "willingly."

Carlton acknowledged telling Brooke that she could choose another dog from the litter because her sister Bethaney felt that Charlie was hers. She admitted that she never told Bethaney that Charlie did not belong to her.

Carlton stated that Dunagen drove up to her house and began blowing her horn. She said she told her granddaughters to get their things together so that Dunagen would not bother her neighbors. Carlton denied scratching Dunagen or going out to Dunagen's car. She claimed that her daughter, her granddaughters, and the officer that wrote the initial report regarding the incident had lied.

Mamie Cain, Carlton's sister, testified that she was with Carlton when she got Charlie at Dunagen's home. She said as she was sitting in Carlton's car, she observed Carlton tell Dunagen that she needed Charlie for breeding purposes, and she saw her pick up Charlie and walk back to the car. Cain said that she did not hear Carlton and Dunagen argue during this conversation. When they returned home, Cain said that she heard Dunagen drive up to Carlton's home and begin honking her horn. She said that she helped Carlton's granddaughters gather their belongings before they left. Cain admitted that Carlton's granddaughters were unhappy that Carlton had taken Charlie.

Cain said that she was with Carlton when she first gave Charlie to Dunagen, and she heard Carlton tell Dunagen that she was going to have to get Charlie back so that she could breed him. She also stated that Dunagen often drank and "threw fits" and that Carlton and Dunagen did not have a good relationship.

The trial court sentenced Carlton to eleven months and twenty-nine days, with sixty days of service followed by probation. The judgment was entered on May 6, 2009. Carlton did not file a motion for a new trial; however, she filed a timely notice of appeal on May 14, 2009.

## ANALYSIS

Carlton argues that the evidence was insufficient to convict her of theft of property valued at $500 or less. In response, the State argues that the jury chose to accredit the testimony of Calton's daughter and granddaughters and that the judgment should be affirmed because "the evidence produced at trial was sufficient for a rational jury to find beyond a reasonable doubt that the defendant committed theft when she took Charlie."

When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978)), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland,

958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Carlton was convicted of theft of property valued at $500 or less. The law provides that "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103. Theft of property is a Class A misdemeanor "if the value of the property or services obtained is five hundred dollars ($500) or less[.]" Id. § 39-14-105(1). An "owner" is defined as "a person, other than the defendant, who has possession of or any interest other than a mortgage, deed of trust or security interest in property, even though that possession or interest is unlawful and without whose consent the defendant has no authority to exert control over the property[.]" Id. § 39-11-106(a)(26).

Carlton argues that she did not give the dog to her daughter as a gift but loaned the dog to her daughter and granddaughters. However, when this issue was presented to the jury at trial, the jury chose to accredit the testimony of the State's witnesses over Carlton's testimony, as was its prerogative. See Odom, 928 S.W.2d at 23. We agree with the State's assertion that "[t]he jury could infer that the defendant's timing in getting Charlie, right after the conclusion of her vandalism trial, was prompted by spite and revenge rather than the exercise of any ownership rights." As previously stated, we will not "reweigh or reevaluate the evidence." See Philpott, 882 S.W.2d at 398. Because the proof was sufficient to support the conviction, the trial court's judgment is affirmed.

Although we recognize that the Carlton's sentence appears harsh given the facts of this case, Carlton, as a pro se defendant, chose to challenge the sufficiency of the evidence in this case rather than her sentence. The appellant has the burden of identifying the issues on appeal. See Tenn. R. App. P. 27(a)(4), (7) (providing that the appellant's brief shall contain "[a] statement of the issues presented for review" and "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief"); see also Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Furthermore, based on the record, we conclude that Carlton's sentence does not rise to the level of "plain error." See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."); Tenn. R. Evid. 103(d) ("Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court."); State v.

Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (establishing the five factors that should be considered by this court when determining whether an error is "plain error.") Accordingly, we are without jurisdiction to consider the issue of sentencing in this case.

## CONCLUSION

Upon review, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE